## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA       *

v.       *      **Crim. No. GLR-17-0223**

TERRELL PLUMMER       *

## DEFENDANT TERRELL PLUMMER'S
## CONSOLIDATED MEMORANDUM OF LAW IN REPLY TO GOVERNMENT'S
## OPPOSITION TO DEFENDANTS' PRE-TRIAL MOTIONS

**JAMES WYDA**
**Federal Public Defender**
**for the District of Maryland**

**NED SMOCK**
**SHARI SILVER DERROW**
     **Assistant Federal Public Defenders**
**Office of the Federal Public Defender**
**100 South Charles Street**
**Tower II, 9th Floor**
**Baltimore, Maryland 21201**
**Phone: (410) 962-3962**
**Fax: (410) 962-0872**

# TABLE OF CONTENTS

**MOTION TO SUPPRESS TANGIBLE
AND DERIVATIVE EVIDENCE AND STATEMENTS (Docket No. 288)**…………………2

    **I.**    **Motion to Suppress Evidence from April 26, 2017 Search**……………..………2

    **II.**    **Motion to Suppress Evidence from Records, Information,
and Data from Cell Phone Linked to Mr. Plummer**……..……………………..6

    **III.**    **Motion to Suppress Evidence Obtained from Facebook and Instagram**……..…6

    **IV.**    **Motion to Suppress DNA Evidence**……………………………………………7

    **V.**    **Motion to Suppress Statements**……………………………………………..7

**MOTION TO SUPPRESS CELL-SITE LOCATION INFORMATION
SEIZED WITHOUT A WARRANT (Docket No. 289)**……………………………………..8

**MOTION TO DISMISS COUNTS SIX THROUGH EIGHT
BASED ON SUPREME COURT'S DECISION IN *JOHNSON* (Docket No. 286)**……...…10

**MOTION TO DISMISS COUNTS THREE THROUGH EIGHT
FOR FAILURE TO STATE AN OFFENSE (Docket No. 287)**……………...………………18

**MOTION FOR DISCLOSURE OF 404(b) AND 609 EVIDENCE (Docket No. 292)**…..…20

**MOTION TO EXCLUDE GOVERNMENT'S PURPORTED
DRUG-TRAFFICKING EXPERT OR, IN THE ALTERNATIVE,
FOR A *DAUBERT* HEARING (Docket No. 281)**……………………………………..…22

**MOTION TO EXCLUDE GOVERNMENT'S PURPORTED NEGATIVE
FINGERPRINT AND DNA EXPERTS OR, IN THE ALTERNATIVE,
FOR A *DAUBERT* HEARING (Docket No. 282)**……………………………..………26

**MOTION TO EXCLUDE GOVERNMENT'S
BALLISTICS TRAJECTORY EVIDENCE OR, IN THE ALTERNATIVE,
FOR A *DAUBERT* HEARING (Docket No. 308)**……………..………………………28

# TABLE OF AUTHORITIES

**Cases**

*Baker v. State,* 284 Ga. 537, 668 S.E.2d 716, 717–18 (2008) ...................................................... 34

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) .................................................................. 8

*Crawford v. Washington*, 541 U.S. 36, 61 (2004) ....................................................................... 38

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) ........................ passim

*Davis v. Washington*, 547 U.S. 813, 822 (2006) ........................................................................ 38

*Illinois v. Gates*, 462 U.S. 213, 238 (1983) ................................................................................. 2

*Illinois v. Krull*, 480 U.S. 340, 355 (1987) ................................................................................. 8

*In re Irby*, 858 F.3d 231 (4th Cir. 2017) ..................................................................................... 10

*Johnson v. United States*, 135 S. Ct. 2251 (2015) ...................................................................... 10

*Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ...................................... 31

*Kyllo v. United States*, 533 U.S. 27, 34 (2001) ............................................................................ 9

*McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) ................................................. 12

*Riley v. California*, 134 S. Ct. 2473 (2014) ................................................................................. 9

*Sgro v. United States*, 287 U.S. 206, 210-11 (1932) .................................................................... 4

*Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999) .............. 31

*United States v. Amparo*, 68 F.3d 1222, 1225 (9th Cir. 1995) .................................................. 16

*United States v. Blackwood*, 913 F.2d 139, 141 (4th Cir. 1990) ................................................. 3

*United States v. Bowie*, 232 F.3d 923, 929 (D.C.Cir.2000) ........................................................ 21

*United States v. Bynum,* 293 F.3d 192, 193–94, 197–98 (4th Cir. 2002) ................................... 3

*United States v. Cardena*, 842 F.3d 959 (7th Cir. 2016) ........................................................... 16

*United States v. Carrasco*, 381 F.3d 1237, 1241 (11th Cir. 2004) ............................................ 20

*United States v. Castleman*, 572 U.S. 157 (2014) ...................................................................... 10

*United States v. Castro-Gomez*, 792 F.3d 1216 (10th Cir. 2015) ............................................... 15

*United States v. Chavez*, 894 F.3d 593 (4th Cir. 2018) ............................................................... 8

*United States v. Dowling*, 753 F.2d 1224, 1236 (3d Cir. 1985) ................................................. 29

*United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) ...................................................... 24

*United States v. Eshetu*, 898 F.3d 36 (D.C. Cir. 2018) .............................................................. 16

*United States v. Fisher*, 2017 WL 1426049, at *6 (E.D. Pa. Apr. 21, 2017) .............................. 13

*United States v. Fuertes*, 805 F.3d 485, 494 n.4 (4th Cir. 2015) ............................................... 21

*United States v. Fultz*, 18 F. Supp. 3d 748, 757 (E.D. Va. 2014) .................................................. 34

*United States v. Gorman,* 613 F.3d 711, 719 (7th Cir.2010) ....................................................... 21

*United States v. Gray*, 2017 WL 3675383 (D. Ariz. Aug. 25, 2017) ......................................... 16

*United States v. Green,* 617 F.3d 233, 248 (3d Cir.2010) ........................................................... 21

*United States v. Grossman*, 400 F.3d 212, 214 (4th Cir. 2005) .................................................... 3

*United States v. Haines*, 803 F.3d 713, 730 (5th Cir. 2015) ....................................................... 29

*United States v. Harris*, 205 F. Supp. 3d 651, 671 (M.D. Pa. 2016) ........................................... 13

*United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) ............................................... 23

*United States v. Hill*, 890 F.3d 51, 55-56 (2d Cir. 2018) ............................................................ 16

*United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) ............................................................ 18

*United States v. Irving,* 665 F.3d 1184, 1215 (10th Cir.2011) .................................................... 21

*United States v. Jennings*, 195 F.3d 795, 797-98 (5th Cir. 1999) ............................................... 16

*United States v. Jones*, 565 U.S. 400 (2012) ............................................................................... 8

*United States v. Jordan*, 924 F. Supp. 443, 447 (W.D.N.Y. 1996) ............................................ 28

*United States v. Kennedy*, 133 F.3d 53, 56-57 (D.C. Cir. 1998) ................................................ 16

*United States v. Leon*, 468 U.S. 897 (1984) ............................................................................. 5, 6

*United States v. Lester*, 234 F. Supp. 2d 595, 598 (E.D. Va. 2002) ........................................... 28

*United States v. Mayo*, 901 F.3d 2018 (3d Cir. 2018) ................................................................ 14

*United States v. McCall*, 740 F.2d 1331, 1335-36 (4th Cir. 1984) ............................................... 4

*United States v. McGuire*, 706 F.3d 1333, 1336-37 (11th Cir. 2013) ......................................... 16

*United States v. McNeal*, 818 F.3d 141 (4th Cir. 2016) ............................................................. 12

*United States v. Middleton,* 883 F.3d 485 (4th Cir. 2017) .......................................................... 12

*United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir. 1987) ................................................ 24

*United States v. Oliver*, 728 F. App'x 107, at *3 n.7 (3d Cir. 2018) ........................................... 13

*United States v. Pineda-Doval*, 614 F.3d 1019, 1040 (9th Cir. 2010) ......................................... 15

*United States v. Prickett*, 839 F.3d 697, 698 (8th Cir. 2016) ..................................................... 16

*United States v. Rafidi*, 829 F.3d 437, 444-45 (6th Cir. 2016) .................................................... 16

*United States v. Resendiz-Moreno*, 705 F.3d 203 (5th Cir. 2013) ............................................... 14

*United States v. Rico-Mejia*, 859 F.3d 318, 321-22 (5th Cir. 2017) ........................................... 12

*United States v. Salas*, 889 F.3d 681 (10th Cir. 2018) ............................................................... 16

*United States v. Serafin*, 562 F.3d 1105, 1107-08 (10th Cir. 2009) ............................................ 16

*United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016)..................................................................... 16

*United States v. Taylor*, 848 F.3d 476, 491 (1st Cir. 2017) ........................................................ 16

*United States v. Torres-Miguel*, 701 F.3d 165 (4th Cir. 2012)........................................................ 11

*United States v. Vera*, 770 F.3d 1232, 1237 (9th Cir. 2014) ........................................................ 38

*United States v. Watts*, 2017 WL 411341 (D. Kansas Jan 31, 2017)........................................ 16

*United States v. Williams*, 548 F.3d 311 (4th Cir. 2008) .................................................................. 5

*United States v. Williams*, 864 F.3d 826, 828 (7th Cir. 2017) ...................................................... 16

*United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) ........................................................ 22

*Voisine v. United States*, 136 S. Ct. 2272 (2016).................................................................. 10, 15

*Whyte v. Lynch*, 807 F.3d 463, 469-72 (1st Cir. 2015) ................................................................ 12

*Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) .................................................................... 2

**Rules**

Federal Rule fo Evidence 702........................................................................................................ 23

Federal Rule of Criminal Procedure 16(a)(1)(G).......................................................................... 26

Federal Rule of Evidence 403........................................................................................................ 24

Federal Rule of Evidence 404(b) .................................................................................................. 20

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Crim. No. GLR-17-0223** |
| **TERRELL PLUMMER** | * | |

**DEFENDANT TERRELL PLUMMER'S**
**CONSOLIDATED MEMORANDUM OF LAW IN REPLY TO GOVERNMENT'S**
**OPPOSITION TO DEFENDANTS' PRE-TRIAL MOTIONS**

Mr. Terrell Plummer, by and through his undersigned counsel, hereby submits this consolidated memorandum in reply to the government's opposition to his pretrial motions. Each motion heading will also include the docket number of the motion to assist the Court in keeping track of all pending motions.

## MOTION TO SUPPRESS TANGIBLE
## AND DERIVATIVE EVIDENCE AND STATEMENTS (Docket No. 288)

**I.      Motion to Suppress Evidence from April 26, 2017 Search**

On April 25, 2017 the government submitted an affidavit to United States Magistrate Judge
Stephanie A. Gallagher seeking authorization to search six residences and three vehicles associated
with six of the defendants in this matter.  Judge Gallagher authorized those searches.  Ex. 13 to
Govt. Opposition (Warrant Affidavit).  Mr. Plummer here challenges the subsequent April 26,
2017 search of 810 Exeter Hall Avenue in Baltimore.  Any tangible or derivative evidence seized
as a result of that search should be suppressed because the warrant affidavit failed to establish a
fair probability that contraband or evidence would be found in the residence.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause,
supported by Oath or affirmation, and particularly describing the place to be searched, and the
persons or things to be seized."  U.S. Const. amend. IV.  In assessing whether a warrant to search
a residence passes muster under the Fourth Amendment, the "critical element . . . is . . . that there
is reasonable cause to believe that the specific 'things' to be searched for and seized are located
on the property to which entry is sought."  *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978).
To establish probable cause for a search, an affidavit must show a likelihood of two things: first,
that the items sought are "seizable by virtue of being connected with criminal activity," and second,
"that the items will be found in the place to be searched."  *Id.* at 555 n.6; *see also Illinois v. Gates*,
462 U.S. 213, 238 (1983) (to establish probable cause, officers must demonstrate "a fair probability
that contraband or evidence of a crime will be found in a particular place.")

In defense of the warrant affidavit the government first emphasizes that three confidential sources identified Mr. Plummer as a member of the Old York Money Gang who "distributed controlled substances throughout the Waverly Way neighborhood."   When police know the identity of a confidential source, the warrant applicant's statement attesting to the source's prior reliability in other investigations can be sufficient to establish the source's reliability in the present case. *See United States v. Bynum,* 293 F.3d 192, 193–94, 197–98 (4th Cir. 2002).   Yet the challenged affidavit did not provide any information establishing a track record of reliability of these confidential informants such that the reviewing magistrate could reasonably rely upon their allegations.  *Compare United States v. Blackwood*, 913 F.2d 139, 141 (4th Cir. 1990) (informant had previously given officer information that had proven to be "true and accurate," and had been used in undercover operations before); *United States v. Grossman*, 400 F.3d 212, 214 (4th Cir. 2005) (informant had previously provided accurate information and information from source had led to arrest of ten people and seizure of more than three kilograms of heroin and cocaine).

The only detail provided regarding these individuals in the affidavit is the fact that each of them grew up in the Waverly Way neighborhood and allegedly know the subjects of the warrant "intimately through personal experiences and observations over the past several years." Ex. 13 to Govt. Opposition at p. 9.  Instead of providing information establishing a track record of reliability, the affidavit indicates that each individual is providing information to law enforcement in an effort to help themselves: two were seeking leniency on pending criminal charges and one receives "occasional financial compensation."  *Id.*  This does not establish a track record of providing reliable information.   If anything, these facts cast doubt upon the veracity of the statements attributed to the informants in the affidavit.

The challenged warrant application was deficient for two additional and interconnected reasons.  First, the information related to alleged drug trafficking activity by Mr. Plummer was stale.  Second, the affidavit failed to establish a sufficient nexus between the target residence and any illegal activity.  Approximately one month passed between the alleged sales of narcotics to an informant on March 23 and 29, 2017 and the search of the residence at 810 Exeter Hall Avenue in April 2017.  Moreover, the warrant affidavit provided information linking Mr. Plummer to the searched residence only in the week prior to the search – not during the time one month earlier that he allegedly sold narcotics to an informant.

"A valid search warrant may issue only upon allegations of 'facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" *United States v. McCall*, 740 F.2d 1331, 1335–36 (4th Cir. 1984) (*quoting Sgro v. United States*, 287 U.S. 206, 210-11 (1932)).  Stale search warrants arise when "the information on which [the search warrant] rested was arguably too old to furnish 'present' probable cause." *McCall*, 740 F.2d at 1336.  Here, the warrant affidavit described two alleged sales by Mr. Plummer to a confidential informant that occurred on March 23, 2017 and March 29, 2017.  The most recent of those two transactions, then, occurred almost a full month before the warrant application was presented to the Magistrate Judge.  The government also relies upon an event in the second week of April 2017 in which agents claimed to observe Mr. Plummer making "hand-to-hand exchanges" related to drug trafficking.  Govt. Oppo., p. 66.  However, the context for those observations, provided in the affidavit, is that a confidential informant had tried to arrange a narcotics transaction with Mr. Plummer that day.  Importantly, for reasons left unexplained in the affidavit, no such transaction occurred.  Instead, the affidavit can only allege that Mr. Plummer was observed conducting hand-to-hand exchanges which agents *believed* were consistent with narcotics trafficking.  Ex. 13 to Govt. Oppo., p. 11.

The passage of one month between the last confirmed drug transaction and the warrant affidavit renders the information contained therein stale.  In other words, the allegations in the affidavit did not establish *present* probable cause that contraband would be located in the residence at 810 Exeter Hall Avenue.

Moreover, while courts have upheld searches of suspects' residences based on evidence of a suspect's involvement in drug trafficking combined with the reasonable suspicion that drug traffickers store drug-related evidence in their homes, there was no meaningful evidence in the affidavit establishing (1) that Mr. Plummer lived at the searched residence one month earlier when the controlled buys occurred; or (2) that any drug trafficking occurred in or near the home such that there might be a case-specific reason to believe that contraband would be found therein.

For the proposition that the warrant affidavit established a sufficient nexus between the crime and the premises sought to be searched the government relies upon *United States v. Williams*, 548 F.3d 311 (4th Cir. 2008).  *Williams* is distinguishable on two grounds.  First, the *Williams* court based its decision upholding a warrant on the good faith exception established in *United States v. Leon*, 468 U.S. 897 (1984).   The case does not hold as a matter of law that an affidavit establishes a sufficient nexus between a searched premises and criminal activity by simply providing evidence that (1) a suspect has been engaged in drug trafficking at some previous time and (2) the suspect has been living at a particular residence more recently.  Second, the affidavit in *Williams* described narcotics trafficking activity by the defendant within days of submission of the affidavit to the reviewing magistrate.  The affidavit noted that law enforcement had listened to "drug pertinent phone calls" involving the defendant as recently as six days before the affidavit was submitted and that agents had observed the defendant meeting with drug suppliers in Houston during the same month the affidavit was submitted.  *Williams*, 548 F.3d at 313.  Again, here the

facts presented in the affidavit only provided evidence supporting a conclusion that Mr. Plummer had been living at the searched residence for the week prior to the submission of the affidavit – whereas the undercover sales had occurred a month earlier.  This absence of evidence establishing that Mr. Plummer resided at the searched premises at the pertinent time, combined with the absence of any evidence suggesting that drug trafficking activity occurred at or near that residence *at any time*, render the affidavit insufficient.  Furthermore, because the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *Leon*, 468 U.S. at 923 (internal quotation marks omitted), the government may not rely upon the good faith exception to save the warrant.

## II.     Motion to Suppress Evidence from Records, Information, and Data from Cell Phone Linked to Mr. Plummer

The defense contends that the pen register/trap and trace order granted on August 29, 2014 was unconstitutional because it relied upon material false representations.  *See* Docket No. 188. Instead of defending the legality of the August 29, 2014 order, the government has stated that it does not intend to use any prospective location information obtained based on that order and contends that any remaining evidence from the phone was independently obtained under an 18 U.S.C. § 2703(d) order.  The defense reserves the right to object to any effort on the government's part to introduce location information or any other evidence that was derived from this phone based upon the August 29, 2014 pen register/trap and trace order.

## III.    Motion to Suppress Evidence Obtained from Facebook and Instagram

The defense seeks suppression of evidence obtained from Facebook and Instagram accounts through a search and seizure warrant.  Having sought a warrant for those accounts, the government now contends that the defendants have no reasonable expectation of privacy in their own social media accounts.  The government relies upon a handful of non-binding district court

opinions, but no case in this District stands for that extraordinary proposition.  The defense maintains that Mr. Plummer had a reasonable expectation of privacy in the contents of his own accounts and that, for the reasons set forth in his motion and the motion of co-defendant Calvin Watson, the evidence should be suppressed.[1]

## IV.     Motion to Suppress DNA Evidence

In response to the defense's motion challenging the seizure of Mr. Plummer's DNA, the government acknowledges that it does not possess any DNA evidence linking Mr. Plummer to the criminal activity alleged in the indictment.  The defense therefore agrees that the Court need not determine whether or not the seizure of DNA was permitted by a warrant justifying the swabbing of Mr. Plummer's mouth for a DNA sample.  The defense addresses elsewhere in this consolidated reply the extent to which the government may offer what it has referred to as "negative DNA" expert testimony.

## V.      Motion to Suppress Statements

The defense moved to suppress "any and all statements, admissions, and confessions allegedly given by the defendant, whether oral, written, or otherwise recorded, which the government proposes to use as evidence against him at trial."  Docket No. 288 at p.1.  The government does not address this motion in its consolidated opposition brief.  The defense therefore assumes that the government does not intend to introduce any statement, admission, or confession allegedly given by the defendant at trial.  To the extent that it does, those statements should be suppressed for the reasons set forth in Mr. Plummer's motion.

---

[1] Further, the defense reserves the right to challenge under Fed. R. Evid. 401 and 403 the admissibility of specific images and content the government may seek to introduce at trial.

## MOTION TO SUPPRESS CELL-SITE LOCATION INFORMATION
## SEIZED WITHOUT A WARRANT (Docket No. 289)

The defendant moved to suppress cell-site location information (CSLI) and per call measurement data (PCMD) obtained by the government without a warrant.  The defense contends that because CSLI information is protected by the Fourth Amendment the government must obtain a warrant supported by probable cause to acquire it.  This position was recently confirmed by the Supreme Court in *Carpenter v. United States*, 138 S. Ct. 2206 (2018).  The government contends that the good faith exception to the exclusionary rule applies because the Section 2703(d) order in this case was obtained prior to the Supreme Court's decision in *Carpenter*.  The government is wrong, and the Court should suppress CSLI and PCMD obtained without a warrant.

The defense acknowledges that the Fourth Circuit recently held that the exclusionary rule does not apply where CSLI was obtained without a warrant prior to the *Carpenter* decision.  *See United States v. Chavez*, 894 F.3d 593 (4th Cir. 2018).  However, the defense contends that *Chavez* was wrongly decided, maintains that suppression is the appropriate remedy, and submits the following arguments to preserve the issue for any possible appeal.

The good-faith exception does not apply to reliance upon a statute whose "provisions are such that a reasonable officer should have known that the statute was unconstitutional."  *Illinois v. Krull*, 480 U.S. 340, 355 (1987).  Here, reliance upon the Stored Communications Act to obtain information from cellular service providers that could provide information about a private party's whereabouts over an extended period of time cannot be said to have been reasonable.  The Supreme Court's decision in *Carpenter* was not a dramatic departure from existing precedent.  In fact, the decision could have easily been predicted based upon a line of cases that preceded it.  In 2012, the Supreme Court held that the police must obtain a warrant before installing a GPS device on a target's vehicle.  *United States v. Jones*, 565 U.S. 400 (2012).  While the *Jones* majority opinion

focused on the physical trespass in its Fourth Amendment analysis, five Justices also agreed that even in the absence of a physical trespass, "'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.'" 565 U.S. 400, 415 (Sotomayor, J., concurring (quoting Alito, J. dissenting)).  *See also Kyllo v. United States*, 533 U.S. 27, 34 (2001) (holding that the use of a thermal imager to detect heat radiating from home was a search); *Riley v. California*, 134 S. Ct. 2473 (2014) (holding that police must generally obtain a warrant before searching the contents of a phone).   Acquisition of records documenting a private citizen's whereabouts was clearly a search, and it was not objectively reasonable – even before *Carpenter* – to seek that information without a warrant supported by probable cause.

## MOTION TO DISMISS COUNTS SIX THROUGH EIGHT
## BASED ON SUPREME COURT'S DECISION IN *JOHNSON* (Docket No. 286)

Mr. Plummer moved to dismiss in part Counts Six, Seven, and Eight based on the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2251 (2015). As explained in the motion, murder in aid of racketeering and conspiracy to commit murder in aid of racketeering do not satisfy the "crime of violence" definition following *Johnson* and, thus, Counts Six through Eight fail to allege any underlying crime of violence and do not state an offense. The government makes three principal arguments in opposition: (1) the government claims that the Fourth Circuit's decision in *In re Irby*, 858 F.3d 231 (4th Cir. 2017), and the Supreme Court's decision in *United States v. Castleman*, 572 U.S. 157 (2014), dictate that murder in aid of racketeering qualifies as a crime of violence under the 18 U.S.C. § 924(c) force clause; (2) the government, relying on *Voisine v. United States*, 136 S. Ct. 2272 (2016), claims that murder in aid of racketeering is a crime of violence because a reckless mens rea is sufficient under the force clause; and (3) the government claims that the categorical approach does not apply to § 924(c) offenses.[2] None of the government's arguments is correct.

---

[2] The government makes no attempt to explain why, in its view, conspiracy to commit murder in aid of racketeering qualifies as a crime of violence. Instead, the government claims only that the conspiracy offense must be a crime of violence because the object of the conspiracy was murder. *See* Govt. Oppo., p. 83 n.14 ("The Government does not address whether racketeering conspiracy is a 'crime of violence' given that Murder in Aid of Racketeering Activity plainly qualifies."). As explained in Mr. Plummer's motion to dismiss, however, the object of the conspiracy is of no import. Regardless of the object of the conspiracy, conspiracy itself is not a crime of violence under the force clause because the act of conspiring is not the use, attempted use, or threatened use of violent physical force. Accordingly, independent of the Court's decision on murder in aid of racketeering, the Court must conclude that *conspiracy* to commit murder in aid of racketeering does not qualify as a crime of violence.

## I.     The government's reliance on *Irby* and *Castleman* is misplaced.

In his motion to dismiss, Mr. Plummer argues that murder in aid of racketeering is not a crime of violence pursuant to the Fourth Circuit's decision in *United States v. Torres-Miguel*, 701 F.3d 165 (4th Cir. 2012), which held that the causation of physical injury does not necessarily entail the use of violent physical force.  The government claims that *Irby* and *Castleman*, however, overruled *Torres-Miguel*.  This is not so.  Moreover, even if the government is correct that *Torres-Miguel* has been overruled, Mr. Plummer is still entitled to relief.

### A.     *Castleman* and *Irby* did not overrule *Torres-Miguel*.

As to *Castleman*, that decision does nothing to disturb *Torres-Miguel*'s logic or holding. In *Castleman,* the Supreme Court held that a Tennessee domestic violence offense that has an element of physical injury qualifies as a misdemeanor crime of domestic violence for purposes of 18 U.S.C. § 922(g)(9) under the force clause of 18 U.S.C. § 921(a)(33)(A)(ii).  *Id.* at 1413-15. However, the force clause of § 921(a)(33)(A)(ii) is critically different from the force clause applicable here and in *Torres-Miguel*.  In fact, in *Castleman,* the Supreme Court explained at great length that it was applying a definition of "physical force" to § 921(a)(33)(A)(ii) that was starkly different from that of the Armed Career Criminal Act's (ACCA) narrower force clause, which requires *violent physical force*.  134 S. Ct. at 1410-15.  Unlike the definition of "physical force" at issue here (and in *Torres-Miguel*), the common law definition of "physical force" at issue in *Castleman* expansively encompassed "even the slightest offense touching" – i.e., de minimis force. *Id.* at 1410.  In this context, the Court held that physical injury necessarily requires de minimis force.  *Id.* at 1413-15.

But more importantly, the Supreme Court in *Castleman* explicitly refused to overrule the reasoning of *Torres-Miguel*.  The *Castleman* Court wrote that "*[w]hether or not the causation of*

*bodily injury necessarily entails violent force [is] a question we do not reach.*"   *Id.* at 1413 (emphasis added).   That, of course, is the question any decision abrogating *Torres-Miguel* must answer.   Because *Castleman* failed to reach the question *Torres-Miguel* answered, *Torres-Miguel* remains binding precedent that this Court has no choice but to follow.

Indeed, the Fourth Circuit recognized as much in *United States v. McNeal*, 818 F.3d 141 (4th Cir. 2016), in rejecting the government's *Castleman* argument: "The government suggests that the Supreme Court's decision in *United States v. Castleman*, __ U.S.__, 134 S. Ct. 1405 (2014), has abrogated the distinction that we recognized in *Torres-Miguel* between the use of force and causation of injury.   That strikes us as a dubious proposition.   Writing for the *Castleman* majority, Justice Sotomayor expressly reserved the question of whether causation of bodily injury necessarily entails violent force." *Id.* at 156 n.10.

In *United States v. Middleton,* 883 F.3d 485 (4th Cir. 2017), the Fourth Circuit again confirmed that *Castleman* did not overrule its previous holding in *Torres-Miguel* that "a crime may result in death or serious injury without involving [the] use of physical force." *Id.* at 491; *see also United States v. Rico-Mejia*, 859 F.3d 318, 321–22 (5th Cir. 2017) (rejecting government's *Castleman* argument to find that threat of death or serious physical injury element in Arkansas terroristic threats statute does not require threat of violent physical force); *Whyte v. Lynch*, 807 F.3d 463, 469–72 (1st Cir. 2015) (rejecting government's *Castleman* argument to find that Connecticut aggravated assault statute with physical injury element is not a crime of violence under the force clause).   Thus, *Castleman* does not overrule *Torres-Miguel*.

As to *Irby*, the three-judge panel in that case had no authority to overrule *Torres-Miguel*. It is well settled that "one panel cannot overrule a decision issued by another panel." *McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc).   "When panel opinions conflict,

[courts] are obliged to apply 'the earliest-case-governs' rule and adhere to 'the earlier of the conflicting opinions.'" *United States v. Williams*, 806 F.3d 253, 261 (4th Cir. 2015) (citation omitted). Thus, this Court must adhere to the Fourth Circuit's decisions in *Torres-Miguel* and *McNeal*, which held that *Torres-Miguel* has not been overruled by the Supreme Court's decision in *Castleman*. *See also Middleton*, 883 F.3d at 491 ("As a matter of precedent, *Irby* . . . cannot rely on *Castleman*—for a holding it did not make—in order to surmount this Court's prior decision in *Torres-Miguel*.".

In sum, *Torres-Miguel* controls, and this means that murder in aid of racketeering is not a crime of violence.

## II. Even if *Torres-Miguel* has been overruled, murder in aid of racketeering still fails to qualify as a crime of violence because it can be committed by acts of omission.

Nevertheless, even if the Court finds that *Castleman* and *Irby* overrule *Torres-Miguel* – which Mr. Plummer vigorously disputes – Mr. Plummer is still entitled to relief. *Castleman* and *Irby* do nothing to undo his argument that murder in aid of racketeering is not a crime of violence because it can be committed by *acts of omission*:

> The *Castleman* reasoning deals with *affirmative acts* leading to the indirect use of force, but does not resolve whether *acts of omission* could also lead to the indirect use of force. *Castleman* said that the use of force was the act of employing poison as the device to cause physical harm, and it noted that physical force was simply force exerted by and through concrete bodies . . . But it cannot be said that physical force has been used when no act has been performed, when the act has been one of omission, since there has been no force exerted by and through concrete bodies.

*United States v. Harris*, 205 F. Supp. 3d 651, 671 (M.D. Pa. 2016) (emphasis added); *see also United States v. Oliver*, 728 F. App'x 107, at *3 n.7 (3d Cir. 2018) (same); *United States v. Fisher*, 2017 WL 1426049, at *6 (E.D. Pa. Apr. 21, 2017) (same). Likewise, *Irby* never addressed whether acts of omission may lead to the use of violent physical force, as the parties never raised this issue.

The Third Circuit's recent decision in *United States v. Mayo*, 901 F.3d 2018 (3d Cir. 2018) reinforces that *Castleman* did not address or decide whether an act of omission is sufficient to cause violent physical force.  In *Mayo*, the Third Circuit—citing the Fourth Circuit's decision in *Middleton*—explained that "*Castleman* did not answer whether causing serious bodily injury without any affirmative use of force would satisfy the violent physical force requirement of the ACCA."  *Mayo*, 901 F.3d.

And, as the *Mayo* court concluded, it would not.  As the court explained, although the government was able to cite case law holding to the contrary, those cases were unavailing because they "conflate an act of omission with the use of force, something that *Castleman*, even if it were pertinent, does not support."  *Mayo*, 901 F.3d.  Moreover, the *Mayo* court explained, the Fifth Circuit in *United States v. Resendiz-Moreno*, 705 F.3d 203 (5th Cir. 2013), has reached a similar conclusion that acts of omission are not sufficient to cause violent physical force.  *See Resendiz-Moreno*, 705 F.3d at 205 (concluding that Georgia first-degree cruelty to children is not a crime of violence because it can be committed "by depriving the child of medicine or by some other act of omission that does not involve the use of physical force").  Thus, the *Mayo* court held, because the offense at issue in that case, Pennsylvania aggravated assault, may be committed through acts of omission, it "sweeps more broadly than the ACCA's definition of 'physical force'" and does not qualify as a violent felony.

So too here, because murder in aid of racketeering can be committed through acts of omission, it does not qualify as a crime of violence under the identical § 924(c) force clause.

## III.   *Voisine* does nothing to undo Mr. Plummer's entitlement to relief.

Murder in aid of racketeering is not a crime of violence under the § 924(c) force clause for the additional reason that it can perpetrated with merely a reckless mens rea.  The government

claims, however, that the Supreme Court's decision in *Voisine* held that a reckless mens rea is sufficient to satisfy the force clause. *Voisine* held no such thing.

In *Voisine*, the Supreme Court held that a prior Maine assault conviction with a reckless mens rea qualified as a "misdemeanor crime of domestic violence" for purposes of 18 U.S.C. § 922(g)(9) under the force clause of 18 U.S.C. § 921(a)(33)(A). However, as explained above, the force clause of § 921(a)(33)(A) is critically different from the force clause applicable here. Indeed, the Supreme Court in *Voisine* itself recognized this. The Court noted that "our decision today concerning § 921(a)(33)(A)'s scope does <u>not</u> resolve whether § 16 includes reckless behavior." *Id.* at 2280 n.4 (emphasis added). The Court explained that "[c]ourts have sometimes given those two statutory definitions divergent readings in light of difference in their contexts and purposes, and we do not foreclose that possibility with respect to their required mental states." *Id.*

Moreover, the government's reliance on *Voisine* ignores binding Fourth Circuit precedent. The majority of the judges on the *Middleton* panel (Judges Harris and Floyd) agreed that *Voisine* does not apply to the ACCA force clause, which contains the same intentional force requirement as § 924(c)'s force clause. <u>See</u> 833 F.3d at 498–500 (Floyd, J., concurring).

Finally, the Court should reject the government's claim that some crimes with reckless mens rea satisfy the force clause while others do not. *See* Govt. Oppo., p. 91-93. In effect, the government says that an extreme degree of risk is equivalent to the intentional use of force. The cases cited by the government in its response do not stand for this proposition or should be disregarded. *United States v. Pineda-Doval*, 614 F.3d 1019, 1040 (9th Cir. 2010), did not even involve the question of whether the second-degree murder offense at issue qualifies as a crime of violence. In *United States v. Castro-Gomez*, 792 F.3d 1216 (10th Cir. 2015), the Tenth Circuit likewise did not address the question of whether a reckless mens rea is sufficient for the force

clause because it found that the Illinois attempted murder offense at issue required a more culpable state of mind than recklessness. *See id.* at 1220 (stating that the Illinois attempted murder offense requires an "intent to kill—which is a more culpable state of mind than intent to do great bodily harm or even reckless and depraved indifference").[3]  As to *United States v. Gray*, 2017 WL 3675383 (D. Ariz. Aug. 25, 2017), that case is an unpublished district court case that lacks any precedential value.  The Court cannot rely on the above cases to conclude that a reckless mens rea is sufficient under the force clause.  It is not.

Because murder in aid of racketeering can be committed with a reckless mens rea, it does not satisfy the § 924(c) force clause.

## IV.     The government is wrong that the categorical approach does not apply.

As to the government's last argument that the categorical approach does not apply, the Fourth Circuit has already decided, in accord with ten other circuits[4] and the Supreme Court, that

---

[3]      Murder in aid of racketeering cannot qualify as a crime of violence for the additional reason that it can be committed without any intent to murder at all.  For example, Maryland second-degree felony murder—which is listed in the indivisible second-degree murder statute—does not require that the defendant intend to "kill the victim or inflict such serious bodily harm that death would be the likely result."  1-5 Md. Crim. Jury Instructions and Commentary § 5.52(D).  Instead, the defendant need only intend "to commit the underlying felony."  *Id.*  Thus, the offense can be accomplished by simply *causing* death.  It is for this reason that the court in *United States v. Watts*, 2017 WL 411341 (D. Kansas Jan 31, 2017), held that Missouri second-degree felony murder, which also does not require an intent to kill, did not constitute a crime of violence.  *See id.* at *8-9.

[4]      *See United States v. Taylor*, 848 F.3d 476, 491 (1st Cir. 2017); *United States v. Hill*, 890 F.3d 51, 55–56 (2d Cir. 2018); *United States v. Jennings*, 195 F.3d 795, 797–98 (5th Cir. 1999); *United States v. Rafidi*, 829 F.3d 437, 444–45 (6th Cir. 2016); *United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016); *United States v. Cardena*, 842 F.3d 959 (7th Cir. 2016); *United States v. Williams*, 864 F.3d 826, 828 (7th Cir. 2017); *United States v. Prickett*, 839 F.3d 697, 698 (8th Cir. 2016); *United States v. Amparo*, 68 F.3d 1222, 1225 (9th Cir. 1995); *United States v. Salas*, 889 F.3d 681 (10th Cir. 2018); *United States v. Serafin*, 562 F.3d 1105, 1107–08 (10th Cir. 2009); *United States v. McGuire*, 706 F.3d 1333, 1336–37 (11th Cir. 2013); *United States v. Eshetu*, 898 F.3d 36 (D.C. Cir. 2018); *United States v. Kennedy*, 133 F.3d 53, 56–57 (D.C. Cir. 1998).

the categorical approach does indeed apply to § 924(c) offenses.  In *United States v. Fuertes*, 805 F.3d 485 (4th Cir. 2015), the Fourth Circuit explained that, "[i]n determining whether an offense qualifies as a 'crime of violence' under either [the § 924(c) force clause or residual clause]," the court must "employ the 'categorical approach' or the 'modified categorical approach.'"  *Id.* at 498. The Fourth Circuit again reinforced in *McNeal* that, "[i]n determining whether an offense is a crime of violence under either clause, we utilize the categorical approach."  818 F.3d at 152.  The Fourth Circuit's holdings are consistent with the Supreme Court's decision in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018).  In *Dimaya*, the Court held that § 16(b) – which is identical to § 924(c)(3)(B) – "demands a categorical approach."  *Id.* at 1217-18.  Accordingly, the government's claim that the categorical approach does not apply runs afoul of controlling Fourth Circuit and Supreme Court precedent, and must be rejected.

For all the above reasons, the Court should dismiss Counts Six, Seven, and Eight of the Superseding Indictment, insofar as they fail to allege any underlying crime of violence.  The Court should strike the crime of violence language from the indictment, and instruct the jury at trial that the government can only prevail if it can prove that Counts Six, Seven, and Eight were committed in furtherance of drug trafficking crimes.

## MOTION TO DISMISS COUNTS THREE THROUGH EIGHT
## FOR FAILURE TO STATE AN OFFENSE (Docket No. 287)

Mr. Plummer has moved to dismiss Counts Three through Five, alleging racketeering violations, because the indictment does not claim – and, indeed, contradicts – that any of the charged offenses were related to racketeering activity.  Attempting to sidestep the facts in the indictment, the government claims that Counts Three through Five should not be dismissed because, even if the events of July 31-August 1, 2014, "may have arisen from a dispute involving two women," they "quickly became the business of the gang."  Govt. Oppo., p. 114.  The government is incorrect and, in any event, asks the Court to consider allegations outside the four corners of the indictment – something, the government acknowledges, the Court cannot do.  *See* Govt. Oppo., p. 115 (stating that the Court's review of a Rule 12 motion to dismiss is limited to only whether the indictment "in its four corners" properly alleges the charged offenses).

The facts in the four corners of the indictment make clear that the events in 2014 related to a personal dispute involving two women, not gang activity.  *See* Dkt. No. 98 ¶¶ 16–17.  The government's attempts to supplement the indictment or provide an explanation to the contrary must be disregarded.  While the government was not required to include facts regarding the personal dispute in the indictment, the Court is now bound to consider them in determining whether the government has properly set forth the elements of the charged offenses.  *See United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012).  It has not done so.  Counts Three through Five, therefore, must be dismissed.

Upon granting Mr. Plummer's motion to dismiss Counts Three through Five, the Court should also dismiss Counts Six through Eight, which incorporate and rely on the earlier counts.  The government does not offer any persuasive reason why Counts Six through Eight, alleging violations of 18 U.S.C. § 924(c), do not fail if Counts Three through Five fail to state an offense.

Rather, the government simply claims that because, in its view, "the arguments about Three through Five fail, the motion should also be denied as to Counts Six through Eight." Govt. Oppo., p. 116 n.20. Using the government's logic, however, the inverse is true. Because Counts Three through Five do, in fact, fail, so too must Counts Six Through Eight. Accordingly, the Court should grant Mr. Plummer's motion to dismiss Counts Three through Eight for failure to state an offense.

**MOTION FOR DISCLOSURE OF 404(b) AND 609 EVIDENCE (Docket No. 292)**

As is explicitly contemplated in the Federal Rules of Evidence, the defense requested notice of the government's intention to introduce any evidence regarding alleged prior or subsequent other criminal conduct and/or "bad acts" which are not charged in any iteration of the indictment and/or not alleged as part of any conspiracy charged in any iteration of the Indictment. Federal Rules of Evidence 404(b). The government contends that the Court should deny the motion as premature or hold it in abeyance pending trial. The Court should not do so.

The policy behind Rule 404(b)'s notice requirement is "to reduce surprise and promote early resolution on the issue of admissibility." *United States v. Carrasco*, 381 F.3d 1237, 1241 (11th Cir. 2004). Instead of committing itself to what particular evidence it will seek to admit, the government posits that any "bad acts" during the time frame of the alleged conspiracy would likely be considered overt acts of those conspiracies. In reliance upon this theory the government states that it does not anticipate seeking to introduce any act except acts that are – according to the government – intrinsic to the charged conspiracies.

It is impossible to respond to the government's argument without knowing which acts it expects to seek to introduce. It is not at all clear that any act allegedly committed by Mr. Plummer between 2013 and 2017 was necessarily related to a racketeering or narcotics conspiracy involving these co-defendants. This should not be a question left to the government alone to answer. The government should not be permitted to avoid the notice requirements of Rule 404(b) by unilaterally determining that any act – whatever its nature and timing – is necessarily "intrinsic to the charged conspiracies."[5] If the government intends to limit itself to introducing evidence establishing (1)

---

[5] The Fourth Circuit recently explained its concern about overuse of this "intrinsic to the crime" theory, which the court warned threatens make Rule 404(b) a "nullity":

> At all events, the intrinsic/extrinsic inquiry has ventured far from where it began. *See* Milton Hirsch, *"This New–Born Babe an Infant Hercules": The Doctrine of*

the overt acts listed in Count 1; (2) alleged drug trafficking conduct that was part of the conspiracy charged in Count 2; and the conduct alleged in Counts 3 through 8 and Counts 17 and 18, then there would be no need for notice of an intention to introduce other "bad acts" pursuant to Rule 404(b).  Because no Rule 404(b) notice has been provided or appears to be forthcoming, the government must be precluded from offering evidence of other acts beyond these clear parameters.

---

*"Inextricably Intertwined" Evidence in Florida's Drug Wars,* 25 Nova L.Rev. 279, 280 (2000) ("[U]ntil about the year 1980, no one thought that evidence of uncharged crimes could be rendered admissible by the simple expedient of describing it as 'inextricably intertwined' with evidence of the crime or crimes actually pleaded in the indictment."). As pointed out by the D.C. Circuit, "it cannot be that all evidence tending to prove the crime is part of the crime. If that were so, Rule 404(b) would be a nullity." *United States v. Bowie,* 232 F.3d 923, 929 (D.C.Cir.2000). Yet, by characterizing evidence as "intrinsic," federal courts, including this one, have allowed prosecutors to introduce evidence of uncharged bad acts free from Rule 404(b)'s protections, including limiting jury instructions and advanced notice of the government's intent to introduce the evidence. Fortunately, some courts have begun to recognize the harm caused by granting federal prosecutors such unmitigated leeway. *See United States v. Gorman,* 613 F.3d 711, 719 (7th Cir.2010) (abandoning the "inextricable intertwinement doctrine" because it "has outlived its usefulness" and "become overused, vague, and quite unhelpful"); *United States v. Green,* 617 F.3d 233, 248 (3d Cir.2010) ( "[T]he inextricably intertwined test is vague, overbroad, and prone to abuse, and we cannot ignore the danger it poses to the vitality of Rule 404(b)."); *Bowie,* 232 F.3d at 927 ("[I]t is hard to see what function this [intrinsic/extrinsic] interpretation of Rule 404(b) performs."); *see also United States v. Irving,* 665 F.3d 1184, 1215 (10th Cir.2011) (Hartz, J., concurring) (stating that "the intrinsic/extrinsic dichotomy serves no useful function and consumes unnecessary attorney and judicial time and effort," and that "the distinction between intrinsic and extrinsic evidence is unclear and confusing, and can lead to substituting conclusions for analysis").

*United States v. Fuertes*, 805 F.3d 485, 494 n.4 (4th Cir. 2015)

## MOTION TO EXCLUDE GOVERNMENT'S
## PURPORTED DRUG-TRAFFICKING EXPERT
## OR, IN THE ALTERNATIVE, FOR A *DAUBERT* HEARING (Docket No. 281)

The defense has moved to exclude the testimony of Special Agent Mark James, noticed by the government as a "drug-trafficking expert."  As set forth in defendant's motion, Rule 702 permits a witness who is qualified as an expert by knowledge, skill, experience, training, or education to testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.  A *Daubert* hearing is essential to establish the scope of Agent James' proposed testimony, his qualifications to render any proposed opinion, and the methodology he is applying in reaching any proposed opinion.

The government has not met its burden of establishing that Special Agent James possesses the qualifications and experience to offer opinion testimony on the wide range of topics listed in the government's expert notice.  Moreover, although testimony based upon a law enforcement officer's experience in the field has been permitted by courts, the government does not meet its burden of establishing the sufficiency of that experience by simply reporting that the proposed expert has been involved in investigating narcotics traffickers.  At a minimum, the defense must be permitted to explore Special Agent James' relevant experience at a *Daubert* hearing.  *See, e.g.*, *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) ("While a district court's task in examining the reliability of experiential expert testimony is therefore somewhat more opaque, the district court must nonetheless require an experiential witness to 'explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how

[his] experience is reliably applied to the facts.'") (quoting Fed. R. Evid. 702 advisory committee's note).

While Rule 702 permits testimony of non-scientists who offer opinions based upon experience, it explicitly "rejects the premise that an expert's testimony should be treated more permissively simply because it is outside the realm of science. An opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist." Fed. R. Evid. 702 advisory committee's note. As applied to an agent seeking to offer interpretations of words and conduct by alleged drug traffickers based solely upon experience, Rule 702 requires that witness to establish how that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. Fed. R. Evid. 702 advisory committee's note. The committee note states: "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id.* A law enforcement agent testifying about the use of code words in a drug transaction must establish that his or her principles and methods are both reliable and applied reliably to the facts of the case. *Id.* Special Agent James must be able to explain at a *Daubert* hearing the principles and methods he uses to interpret particular phrases and words. Otherwise, there is a danger that he will assume the worst about any ambiguous language and offer opinions that have no basis in experience.

Here, the government must establish that the words Agent James proposes to interpret are words and phrases commonly used in the drug trade that he has previously heard. If words about which he proposes to testify had not previously been heard by the Agent, the government must explain his methodology for interpreting those words. *See, e.g.*, *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (noting that although agent had significant experience

investigating drug trafficking, government failed to establish that agent's interpretation of new words or phrases were supported by reliable methods).

Moreover, law enforcement testimony of this nature must be circumscribed to prevent a witness from offering broad conclusions about defendants' activities.  *See, e.g.*, *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) ("Although we approve of testimony interpreting drug code words, such expert testimony, unless closely monitored by the district court, may unfairly 'provid[e] the government with an additional summation by having the expert interpret the evidence,' and 'may come dangerously close to usurping the jury's function.'") (*quoting United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir. 1987)).  Courts have identified a danger in permitting agents to act as summary prosecution witnesses rather than focusing on opinions based on general experience with the drug industry.  For example, an agent may not be permitted to testify about the meaning of conversations in general, beyond the interpretation of code words.  *Id.* at 55 (agent improperly interpreted pronouns and ambiguous statements that were not drug code including testifying that "what's left over there in that can" referred to "probably… bundles of heroin").  The danger is that instead of relying upon experience with drug trafficking investigations and use of code words generally, the agent would be impermissibly relying upon and conveying hearsay evidence to the jury based on knowledge of this case in particular.

The Court must also be wary about permitting testimony regarding drug traffickers generally, including their use of firearms, because there is a real concern that any such testimony would run afoul of Federal Rule of Evidence 403.[6]  For example, proposed testimony about how different "drug shops" function elsewhere in Baltimore is of no relevance to this case.  The

---

[6]     Mr. Plummer reserves the right to challenge the scope of Special Agent Mark's testimony in a future motion *in limine*.

operative question for the jury will be whether *these defendants* were engaged in a drug trafficking conspiracy – not how other individuals may conduct themselves.  Any proposed testimony by Special Agent James would need to be cabined to information helpful to the jury in understanding specific aspects of the evidence in this case that might not otherwise be familiar to a layperson.

For these reasons, Mr. Plummer seeks the exclusion of all testimony of the government's proposed drug-trafficking expert or, in the alternative, a *Daubert* hearing to probe the proposed expert's qualifications and methodology.

**MOTION TO EXCLUDE GOVERNMENT'S PURPORTED
NEGATIVE FINGERPRINT AND DNA EXPERTS
OR, IN THE ALTERNATIVE, FOR A *DAUBERT* HEARING (Docket No. 282)**

Mr. Plummer moved to exclude the government's proposed "negative" fingerprint and DNA experts or, in the alternative, requested a *Daubert* hearing to test the government's proposed expert's qualifications, methodology, and reliability.   Nothing in the government's response defeats Mr. Plummer's entitlement to relief, and in fact, it only underscores why a *Daubert* hearing is critical in this case.

The government claims that, by providing a list of items (e.g., bottles, cigarettes, interior locations of a vehicle) on which it seeks to introduce negative DNA and fingerprint testimony, it has complied with its obligations under Federal Rule of Criminal Procedure 16(a)(1)(G).   That is not so.   The government has yet to provide any bench notes, raw data, and lab protocols associated with either expert – even though its own notice promises to do so as to the government's proposed latent print examiner.   *See* Exhibit 1 to Mot. to Exclude Govt.'s Purported Negative Fingerprint and DNA Experts (stating that Rees' "CV is enclosed along with her bench notes, raw data, and protocols of the ATF print lab).   The government has also remained silent as to what exactly the proposed experts will base their opinions on.   For example, are they basing their opinions on the recovery rate across the entire ATF?   Or just their respective labs?   Or are they basing their opinions on their own personal recovery rates?   Also lacking from the government's notice, or its response, is any explanation as to the form of the experts' testimony on the "frequency" with which latent prints and DNA evidence are recovered.   Are they planning to testify using percentages? Generalities, such as rarely, often, never, always?   The defense is left to wonder as to all these questions and, as a result, cannot prepare effectively for trial.   This does not satisfy Rule 16, and as explained below, it is far from satisfying the requirements of *Daubert*.   *See United States v.*

*Willock*, 696 F. Supp. 2d 536, 577- 78 (D. Md. 2010) (stating that the purpose of Rule 16(a)(1)(G) is "to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination" (citation and internal quotation marks omitted)).

The open-endedness of the government's expert notice raises serious questions as to the proposed expert's qualifications and the reliability of their methodology. The government accuses the defense of "rigidly" or "robotic[ally]" relying on the *Daubert* factors, Govt. Oppo., p. 9–10, but the government's notice and response appear untethered to these extremely important principles. Apparently conceding that its proposed witnesses are not experts in statistics, the government states that it does not intend to offer testimony regarding the probability of recovering latent print or DNA evidence. *See* Govt. Oppo., p. 10. Yet, just a couple pages earlier, the government suggests that it may be appropriate for their experts to refer to "composite data, individual statistics, and percentiles in order to convey to the jury how infrequently latent prints are obtained from [particular] surfaces." Govt. Oppo., p. 8. The government has provided none of this data or information to the defense, and it has not offered any reason why its proposed experts are qualified to interpret such data. A *Daubert* hearing is essential to answer all the above questions and many others raised in Mr. Plummer's initial motion.

In sum, the Court should exclude the testimony from the government's purported negative fingerprint and DNA experts or, alternatively, hold a hearing to determine the scope of the proposed testimony, whether the witnesses are qualified to give that testimony, and whether their methodology satisfies the requirements of *Daubert*. At the very least, the Court should order the government to provide a complete disclosure that complies with the requirements and purpose of Rule 16.

## MOTION TO EXCLUDE GOVERNMENT'S
## BALLISTICS TRAJECTORY EVIDENCE
## OR, IN THE ALTERNATIVE, FOR A *DAUBERT* HEARING (Docket No. 308)

The defense has moved to exclude testimony by ATF employee Gregory S. Klees, offered by the government as an expert in "ballistics trajectory." The defense argued that Mr. Klees lacks qualifications to offer opinions regarding the path of the bullet that struck Ms. Elliott and the origination point of that bullet. Further, the defense explained that any such proposed opinion is not based on reliable data or reliable methodology because Mr. Klees bases his conclusions largely on witness testimony – not on the accepted areas of study in the field: internal ballistics, external ballistics, and terminal ballistics. A *Daubert* hearing is, again, critical to probe the government's purported expert's qualifications and methodology.

Federal Rule of Evidence 702 requires this Court to serve as a gatekeeper for expert testimony to ensure that such testimony is "not only relevant, but reliable." *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). The proponent of the evidence bears a significant burden in proving reliability; a proffer of expert testimony must include the substantive area of the proposed testimony, as well as "'sufficient information regarding the bases for the expert's opinion.'" *United States v. Lester*, 234 F. Supp. 2d 595, 598 (E.D. Va. 2002) (quoting *United States v. Jordan*, 924 F. Supp. 443, 447 (W.D.N.Y. 1996)). "Where the proponent of the testimony fails to present enough evidence to demonstrate to the court the scientific validity of the research supporting the expert's conclusions, the trial court cannot determine whether the testimony is well-founded." *Lester*, 234 F. Supp. 2d at 598.

The gatekeeping role of this Court contemplated in Rule 702 is especially important in this case because there is no physical evidence linking Mr. Plummer to the murder of McKenzie Elliott. The government will have an unfair chance of convicting Mr. Plummer of this extremely serious

offense if it can call a witness to offer opinions that fill in the blanks left by the absent physical evidence.  Those opinions will be even more prejudicial to Mr. Plummer if they have been given the Court's imprimatur as "expert testimony."  Jurors will almost certainly give undue weight to this testimony.  Scientific expert testimony carries with it the "aura of special reliability and trustworthiness," creating a grave risk that jurors will receive it without a critical eye. *United States v. Dowling*, 753 F.2d 1224, 1236 (3d Cir. 1985); *see also United States v. Haines*, 803 F.3d 713, 730 (5th Cir. 2015) (recognizing the significance of expert testimony to juries). Cross-examination cannot solve this problem.

Instead of meeting its burden of demonstrating the scientific validity of Mr. Klees' analysis and proposed conclusions, the government's opposition only amplifies the concerns raised by the defense.  Mr. Klees' testimony must be excluded.  At an absolute minimum, a *Daubert* hearing must be held and his proposed testimony must be narrowed dramatically.

## I.      Mr. Klees Is Not Qualified in the Field of Shooting Incident Reconstruction

The government cannot dispute that the focus of Mr. Klees' career has been toolmark and firearms identification.  His background and relevant experience are listed in a document that was produced to the defense titled "Qualifications as an Expert Witness."  Klees CV, Exhibit D to defense motion at Docket No. 308.  That document lists Mr. Klees' occupation as "Firearms and Toolmark Examiner," and his discipline as "Firearms and Toolmark Identification."  But firearms and toolmark identification is an entirely different area of expertise than shooting incident reconstruction. [7]

---

[7]      The Association of Firearm and Tool Mark Examiners, of which Mr. Klees is a member, describes the discipline this way:  "Toolmark Identification is a discipline of forensic science which has as its primary concern to determine if a toolmark was produced by a particular tool. Firearm Identification is a sub-category of toolmark identification; which has as its primary concern to determine if a bullet, cartridge case, or other ammunition component was fired by a

Mr. Klees is not qualified to offer testimony about shooting incident reconstruction or establishing the path of a bullet.  His CV demonstrates that he has visited many gun and tool manufacturers and attended several conferences on toolmark and firearms identification over the years, but the only arguably relevant training he reports is a crime scene and reconstruction seminar he attended _**22 years ago**_ about which the government discloses nothing.  The government reports that he had "speaking and lecturing engagements" in workshops and training seminars focused on crime scene construction and trajectory analysis, but those events were several years ago and it is not at all clear what information on the field Mr. Klees learned at these events.  Moreover, Mr. Klees' publications are almost exclusively in the area of firearms examination.  The government can point to only _**a single**_ publication from _**13 years ago**_ about observing terminal effects of an unexpanded hollow point bullet in a crime scene investigation that was published in the Association of Firearms and Tool Mark Examiners Journal.

In short, Mr. Klees is unqualified to offer expert opinions on shooting incident reconstruction.  Given his lack of experience in the field, it should come as no surprise that, as explained in the following section, Mr. Klees proposes to offer opinions that go well beyond the scope of anything a recognized, experienced expert in this field would be comfortable with.

## II.    Mr. Klees' Methodology and Application of that Methodology Are Not Reliable

_Daubert_ and its progeny mandate that this Court evaluate the methodology used by a proposed expert and the proposed expert's application of that methodology to determine whether it is reliable before permitting a witness to offer opinions on a disputed issue.  The purpose of such an inquiry is "to make certain that an expert, whether basing testimony upon professional studies

---

particular    firearm."         https://afte.org/about-us/what-is-afte/what-is-firearm-and-tool-mark-identification.

or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999) (quoting *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The Supreme Court identified four factors to assist judges in undertaking this assessment. *Daubert*, 509 U.S. at 593. In evaluating the reliability of expert opinion evidence, a court should consider: (1) whether the theory or technique used by the expert can, and has been, tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the known or potential rate of error" of the technique or method used; and (4) the degree of the method's or conclusion's general acceptance within the relevant scientific community. *Id.* at 593–94.

The defense explained in its moving papers that Mr. Klees lacks the data necessary to apply the principles of shooting incident reconstruction in this case and cannot make a reliable or scientifically valid conclusion about the precise origin of the fatal bullet. This argument was supported by an attached affidavit written by Ross Gardner, an experienced crime scene reconstruction practitioner who has authored a book on the topic. The defense explained that neither the firearm nor the fatal bullet were recovered, meaning that there is no way to determine the type or caliber of weapon used. There were no intermediate or terminal defects located at the crime scene and no bullet was located, meaning that it is impossible to determine with certainty the location of the terminus of the bullet trajectory. The medical examiner can determine the path of the bullet through the victim but has no specific orientation of the victim at the moment of the incident. This makes it impossible to correlate the path of the bullet in the body in relation to the scene itself. Instead of offering an opinion based upon reliable scientific data, Mr. Klees proposes to offer a scientific opinion based largely upon witness statements which he necessarily admits

may not be reliable.   The problem with this approach is self-evident: Mr. Klees' proposed testimony is *based upon* witness testimony and is at the same time offered by the government in an effort to *bolster* that witness testimony.

A review of what little documentation underlies Mr. Klees' proposed opinions demonstrates both the bias and the flaws in his analysis.   First, it is clear that Mr. Klees was asked to work on this case not to determine *where* the shot that hit McKenzie Elliott originated from, but instead to confirm the government's theory that Terrell Plummer fired the shot while standing on a porch at 3545 Old York Road.   Instead of evaluating the physical evidence available to him to reach a conclusion about where the bullet might have been fired, Mr. Klees was presented a hypothesis about the origin of the shot and the identity of the suspected shooter and asked to provide an opinion confirming that hypothetical.   This theory guided his analysis throughout.   For example, Mr. Klees' initial bench notes on the case – apparently prepared before any analysis of the scene – state that witnesses reported that the shooter was standing on a porch at 3545 Old York Road.   The notes further indicate that the shooter was Terrell Plummer, provide his height, and estimate an adjusted muzzle height based upon Mr. Plummer's height.   Ex. A (Klees Investigative and Autopsy Summary).

Understanding Mr. Klees' methodology is especially important here.   Mr. Klees was able to determine based upon the medical examiner's report the angle of the bullet through Ms. Elliott's head.   He then reproduced that trajectory by inserting a rod into a foam mannequin head which he took to the scene of the shooting.   He estimated the location on the porch where Ms. Elliott was standing and the direction she was facing based on an interview with a witness who was at the scene.   He then placed the foam head on the porch at that location and made an effort to determine where the shot originated based upon the outward projection of the trajectory through the

32

mannequin's head using a laser.  This point is very important to emphasize: Mr. Klees' conclusion based upon this mapping analysis was that the firearm barrel "could have been fired from various locations on the east and southeast areas of Old York Road starting eastward from the front porch/front façade located at 3619 Old York Road, extending southeastward and terminating in the front porch area of 3545 Old York Road."  Klees Report, p. 3.  In other words, the shot could have been fired from locations on Old York Road in front of any of *eleven different houses* covering *more than one city block*.  Klees' report then takes the remarkable step – in one sentence that contains no explanation – of concluding that the shot *necessarily* came from the front porch of 3545 Old York Road.  The relevant portion of the report is included here for the Court's information:

> Trajectory mapping analyses, utilizing physical and laser projection methods, were conducted from the foam head trajectory rod located at the above-listed coordinates. This mapping analyses concluded that the firearm barrel, which fired the bullet that perforated the skull of target victim, ELLIOTT, could have been fired from various locations on the east and southeast areas of Old York Road starting eastward from the front porch/front facade located at 3619 Old York Road, extending southeastward and terminating at the front porch area of 3545 Old York Road. Based on these mapping results along with information and physical evidence contained or depicted in Exhibits 1, 4, 6, 17, 18, and 20, it was concluded that the shot that struck target victim, McKenzie ELLIOTT, originated from the front porch area located at 3545 Old York Road.

Klees Report, p. 3.

Review of each of the exhibits listed in the last sentence is the only way to surmise the basis for this conclusion.  Exhibit 1 is the autopsy report which Mr. Klees had already relied upon in determining the angle of the bullet through the foam head.  Exhibits 4 and 6 are transcripts of witness interviews.  Exhibits 17 and 18 are cartridge cases that were found near 3545 Old York Road and two portions of fired bullet jackets that were found in Old York Road.  Exhibit 20 is also a witness interview.  In sum, Mr. Klees made a questionable guess as to the location of Ms. Elliott on the porch and the direction she was facing at the time of the shooting and used a laser to estimate where the shot that hit her may have come from.  That analysis revealed a wide swath of possible

locations covering more than a full block on Old York Road.  He then read and/or watched interviews of witnesses and took into account the location of shell casings located by police officers at the scene and decided that the shot *must have* come from one particular porch of a home on Old York Road.  This leap is by no means an accepted method in his field.  Mr. Klees cannot be permitted to offer this opinion testimony at trial.

With this background in mind the defense here addresses each step attributed to Mr. Klees at pages 14 and 15 of the government's brief:

- *"The witness examined and noted the class characteristics of the fired ammunition evidence from the scene.  The witness concluded that the items could have been fired from certain types of weapons, that had ports designed to eject fired cartridge cases to the right."*

Locating cartridge casings on the street near the porch at 3545 Old York Road does not establish that the fatal shot was fired from that porch.  Even relying on the cartridge evidence as a piece of the puzzle requires an assumption that the cartridge casings found on the sidewalk near that porch were connected to the bullet that struck Ms. Elliott.  This is by no means clear.  Because the bullet that struck Ms. Elliott was never recovered, it is impossible to link the fatal bullet to any of these cartridge casings.  Moreover, it is not clear that those cartridge casings were expelled from a firearm on the day and time of the shooting – they were simply found by law enforcement as officers canvased the area following the shooting.  Finally, this step also requires Mr. Klees to assume that officers found every cartridge casing involved in the shooting and did not miss casings located elsewhere that were ejected when the shot that hit Ms. Elliott was fired, and to further assume that the shot that hit Ms. Elliott was not fired by a weapon that does not expel cartridges.  Even if the cartridge casings were somehow related to the shooting incident, their location does not establish with any specificity the point from which the shots were fired.  *See, e.g., United States v. Fultz*, 18 F. Supp. 3d 748, 757 (E.D. Va. 2014) (noting lack of scientifically tested and peer

reviewed method for reliably determining the origin of a gunshot from the location of spent

casings); *Baker v. State,* 284 Ga. 537, 668 S.E.2d 716, 717–18 (2008) (finding that the use of

ejected shell casings to determine shooter location was unreliable and could not be used to show

that the defendant was not the shooter).

- *"The witness then undertook to conduct a shooting trajectory reconstruction analysis, to determine the barrel position of the firearm that fired the shot that killed Ms. Elliot. That included reviewing information from the crime scene, the firearms evidence, and the autopsy of Ms. Elliot."*

Mr. Klees reviewed crime scene photos and the autopsy report.  It is not clear what

"firearms evidence" he reviewed given that no firearm was ever recovered in this case.

- *"The witness considered the trajectory reconstruction of the bullet that killed Ms. Elliott, performed by the Medical Examiner.  That analysis involved inserting a rod into a foam mannequin model head.  That analysis noted the path of the bullet took through the victim's head.  The analysis concluded that the bullet struck the victim's head from front to rear at particular vertical and horizontal angles (measured with the head in a fully erect position)."*

The medical examiner determined the path of the bullet through the victim's head.  This is

perhaps the only arguably reliable and verifiable piece of information from the scene Mr. Klees

had access to in making his analysis.  However, because the medical examiner did not know where

Ms. Elliott was standing at the time she was hit and what her position was, the medical examiner

could not offer any opinion about how the path of the bullet through the victim's head related to

the trajectory of the bullet from its origin.

- *"The witness reviewed photographs of the bullet-hole entrance and determined that the impact point was characteristic of a bullet on an original pathway, and not a deflection or ricochet."*

Mr. Klees determined that because the entry and exit wounds were relatively small, it was

unlikely that the bullet had hit any other object before striking the victim because presumably the

projectile would have become deformed had it hit another item and the wound would have been

larger.

- *"The witness then went to the crime scene, and positioned the foam head with the attached rod, at a location and position consistent with the witness statements from the August 1, 2014 incident. The specific physical location was stated, by reference to the location's distance from specified points at the crime scene."*

Mr. Klees estimated the bullet's trajectory by placing the foam head on the porch and projecting the line of the shot's path through the mannequin's foam head outward. Mr. Klees' conclusions are based on an assumption that at the time the shot was fired the victim was (1) at a particular location on the porch; (2) standing at a particular height rather than sitting or crouching; (3) facing a particular direction; (4) with her head at a particular angle. The problem here is that the government has not provided any discovery establishing a clear, reliable basis for determining any of these four crucial variables. Slight changes in any one of these variables would alter the location of the origin of the shot dramatically – by hundreds of feet for even small movements of the mannequin to the left or right, higher or lower, or angled up or down.

In determining where to place the foam head, Mr. Klees apparently relied only upon crime scene photos and an interview with an unnamed witness who was on the porch at the time of the shooting. There are no crime scene photos showing where Ms. Elliott fell after she was shot – she was quickly picked up by an individual on scene and moved. Presumably, Mr. Klees is relying upon the location of a blood stain on the porch as a reference point. Even assuming that the blood stain allows one to estimate where Ms. Elliott fell, her location on the ground at the time of her death does not allow one to accurately estimate where on the porch she was standing and how she was positioned when she was shot. Moreover, one cannot assume that the witness account of her general location at the time she was struck was either specific or accurate, particularly in light of well-established problems with witness memory during highly stressful and emotional situations.

At most it appears that a witness told Mr. Klees that Ms. Elliott was on the porch "facing South." Based on this limited information, Mr. Klees provided a specific physical location for Ms.

Elliott in his report and angled the head in a particular way.  That specific physical location and angle was necessarily based largely on guesswork.  Placement of the mannequin at one particular location and angle on the porch might indicate that a shot from the porch of 3545 Old York Road could have hit the victim, whereas placement somewhere else at a different angle might rule out 3545 Old York as the origin.  The danger of course, is that the guesswork was influenced by Mr. Klees' knowledge that law enforcement believed that the shot came from 3545 Old York Road.

- *"Finally, the witness determined the pathway direction of the shot that killed Ms. Elliott through the use of physical and laser projection devices."*

As set forth above, Mr. Klees **did not** establish through use of physical and laser projection devices that the shot originated form 3545 Old York Road.  He only goes so far as to say that physical and laser projection devices revealed that the shot "could have been fired from various locations on the east and southeast areas of Old York Road starting eastward from the front porch/front façade located at 3619 Old York Road, extending southeastward and terminating in the front porch area of 3545 Old York Road."  Klees Report, p. 3.  Any opinion further isolating the origin of the shot is based upon witness testimony – not on scientific evidence.  Indeed, Mr. Klees added an endnote to his report admitting that "much of the information used to formulate these trajectory conclusions were derived from secondary source investigative reports and witness statements.  Therefore, the reliability of these conclusions is incumbent on the relative accuracy of these secondary sources."  *Id.* at p. 4.  The government acknowledges that "leaving aside the witness information, Mr. Klees opined that the shots could have come from various locations on the east and southeast areas of Old York Road, between 3619 Old York and 3545 Old York."  Govt. Oppo., p. 13.  In fact, even this broader conclusion appears to be premised upon an assumption made in reliance on a witness statement that the victim was facing South at the time she was shot.

**III.     The Court Must Not Permit Mr. Klees to Retransmit Testimonial Hearsay to the Jury in Violation of the Rules of Evidence and the Confrontation Clause**

Were Mr. Klees permitted to testify based upon statements obtained through police interviews and other out-of-court statements, he would be simply transmitting hearsay to the jury. The Confrontation Clause of the Sixth Amendment forbids the government from presenting the substance of such testimonial hearsay to the jury. *Davis v. Washington*, 547 U.S. 813, 822 (2006). The government cannot use Federal Rule of Evidence 703 to make an end-run around the Bill of Rights. *Crawford v. Washington*, 541 U.S. 36, 61 (2004) ("When testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'"). An expert may not simply re-transmit hearsay or other inadmissible evidence to the jury in the guise of an expert opinion. *United States v. Vera*, 770 F.3d 1232, 1237 (9th Cir. 2014) ("[A]n expert exceeds the bounds of permissible expert testimony and violates a defendant's Confrontation Clause rights when he is used as little more than a conduit or transmitter for testimonial hearsay. . . .") (internal quotation marks omitted).

The last step of Mr. Klees' "analysis," in which he jumps from the possibility that the shot could have come from the area in and around eleven houses on Old York Road to specifically pinpointing the porch of 3545 Old York Road is where his re-transmittal of hearsay statements is most glaring. With respect to the wider range of possible origins, it is at least arguable (although the defense by no means concedes that his methodology or application of that methodology were reliable) that Mr. Klees applied his purported expertise in the field by using a trajectory rod and a laser. However, his admitted basis for concluding that the shot came from the porch of one particular house is that he read witness statements to that effect. It cannot possibly be argued that Mr. Klees applied his expertise to this conclusion. Any effort on his part to suggest a specific

38

origin of the shooting trajectory would involve nothing more than re-transmitting hearsay from other witnesses.

In sum, this Court must either exclude Mr. Klees' testimony entirely for the above reasons or it must convene a *Daubert* hearing to further explore Mr. Klees' background, his methodology, and his application of that methodology to the facts of this case.  Mr. Klees should not be permitted to offer an opinion that strays from accepted methodology in the field of shooting incident reconstruction and simply involves parroting the testimony of witnesses.


Respectfully submitted,

JAMES WYDA
Federal Public Defender
for the District of Maryland


_____/s/_____
NED SMOCK
SHARI SILVER DERROW
Assistant Federal Public Defenders
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-0872
Email:  Ned_Smock@fd.org
            Shari_Derrow@fd.org